[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action proceeds on the complaint dated February 5, 1989 and answer dated April 26, 1989 with amendments.
Plaintiffs were the owners of a shopping center located and known as 655 Main Street, in East Haven, Connecticut, in which was located a laundromat owned and operated by the defendants Joseph Gargano and Alex Sabellico, as the East Haven Plaza Laundromat.
Defendants had owned and operated the laundromat for many years and on September 27, 1988 were occupying the premises on a renewal of previous agreements.
On September 27, 1988 at a hearing in an eviction action returned to the Housing Session of the Superior Court at New Haven, Docket CVNH 8903-3103, the parties entered into a stipulated agreement of the same date, whereby the operation of the business was to cease on or before 9/30/88 and defendants were to "remove all machines and setups without causing damage to the walls and/or ceilings" and "remove bulk head, and plaintiffs makes no claim of damages for the hole that will be left."
Plaintiff, while admitting that defendants complied with other terms of the agreement, such as moving out by October 15, 1988 and making a payment of $9,000 to plaintiff, nevertheless breached the agreement in causing damages to the premises in removing bulk head and setups.
An understanding of the latter two terms is made clearer by a reference to the laundromat of defendants.
Its facilities includes 21 cleaning and drying machines of one type and 13 cleaning and drying machines of another type, including 4-18 pound machines, 9-20 pound machines and 2 dry cleaning machines. Various of these units were serviced by electricity, gas and water. There were also vents for ventilation.
The main supply source of electricity, gas and water were made available from the outside of the rented premises to the inside of it. The structure whereby defendants would convert the main supply sources of electricity, gas and water to multiple supply sources to operate the numerous various laundromat facilities would be and were known as bulk head, which would include any box — like effect, or compartment needed for and in the operation of the various facilities. Bulk head included such vertical partitions or existed from the top of the various units to the ceiling. CT Page 7566
Within the above context, setup would consist of such facilities or arrangement of them as were needed or used to operate the facilities of the business or make them easier for operation. Bulk head of the defendants was not of the more modern type shown in Exhibit 9.
II-A.
A dispute exists between the parties as to facilities which were disconnected and subject to removal from the premises.
Plaintiff landlord claims it included property which belonged to plaintiff. Defendants (tenants) claim they removed only such property as belonged to them and to the extent any other was involved, plaintiff had directed the defendants to remove it.
At the September 27, 1988 eviction hearing there had been negotiations between the parties upon which the action of the housing session of the court had acted. To the extent that the housing session action related to possession of the premises leading to the eviction of defendants, it is recognized as a judgment. But to the extent it relates to the removal of machines and setups and bulk head, it is not a judgment but only a stipulated agreement of the parties upon which the instant action before the undersigned is based.
"A judgment upon which a suit is to be predicated must be a final and complete thing, upon which execution might have issued for its enforcement. . . ." Cothren v. Olnsted, 57 Conn. 329, 332. See also Garguilo v. Moore, 156 Conn. 359.
II-B.
This opinion proceeds on the stipulated agreement. Plaintiff claims there has been a breach of the stipulated agreement.
"In an action at law based upon contract, the party seeking recovery has the burden of proving by the fair preponderance of the evidence the amount of his damages. (citations omitted). The court must have evidence by which it can calculate the damages which is not merely . . . speculative, but which allows for some objective ascertainment of the amount (citations omitted)". Bronson Townsend v. Baltistoni, 167 Conn. 321, 326.
II-C.
In his testimony, Leon Silverman, a general partner and president of the plaintiff, admitted he participated in the 9/27/88 discussions and proceeding by and through his daughter, CT Page 7567 who was present at the proceeding and in touch with him by phone. He acknowledges that the wording of the order of 9/27/88 of the housing court is as valid as though it bore his own signature instead of his daughter's.
The laundromat premises contained an area of 2350 square feet. Its use was for the operation of a typical first class coin operated on premises laundry and dry-cleaning establishment.
Defendants were occupying the laundromat premises when the plaintiff-lessor bought the real estate property in 1981. Leon Silverman visited the premises almost weekly and was acquainted with the arrangement of the facilities of the defendants' laundromat.
At the September 27, 1988 eviction hearing, the two attorneys representing the parties discussed what was to be removed. Attorney Aiardo, who represented the defendants at that time, and attorney Marcucci who represented the plaintiff, testified before me in the present hearing.
 "A contract is to be construed according to what may be assumed to have been the understanding and intention of the parties . . . . That intention is to be determined from the language used, interpreted in the light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. . . ." Milford Education Association v. Board of Education, 167 Conn. 513, 522.
The stipulated agreement of September 27, 1988 of the parties provided in part that "defendants shall remove all machines and setups without causing damage to the walls and/or ceilings. Defendant shall remove all bulk head and plaintiff makes no claim of damage for the hole that will be left."
The lease agreement of the parties at the time (Exhibit 2, Section 8.1.9) provided that "at the expiration of the lease terms or earlier termination of the lease," (defendant was) "to remove all trade fixtures and personal property and all interior partitions installed by tenant and such other installations made by tenant as landlord may request or tenant may elect . . . to repair any damage caused by such removal . . . and yield up the premises (except for such interior partitions installed by tenant and such other installations made by tenant as landlord shall request tenant, or tenant shall elect to remove) broomless clean CT Page 7568 and in the same good order and repair in which tenant is obliged to keep and maintain the premises by the provision of this lease."
Insofar as appears from the photographs in evidence the debris shown in them is consistent with the materials in the setups and bulk head facilities and materials intended by the stipulated agreement of 9/17/88; which plaintiff directed and authorized to be removed and which necessarily involved their disconnections.
Except for a map showing the location of the area of the premises in question in reference to the greater commercial center there was no showing by plaintiff of the repairs or replacement of the facilities plaintiff claims to have made, as compared to those in place in the defendants' business, to permit a reasonable determination of the relevant damages suffered by plaintiff.
It is found that included in the term machines clearly were the wet washing and dry cleaning machines. Also included in the term setups were all the facilities and items, within the premises, being used for their operations, from the respective units to the supply sources of electricity, water and gas available at the inside walls, floor and ceiling, also known as bulk head, which were in place for the operations of the respective units serving the laundromat business.
It is further found that the gas, water and electrical power facilities within the premises serving the various units in the operation of the laundromat are within the meaning of setups.
On the basis of the foregoing determination the consideration of the expenditure of $9,200. for electrical work and of $17,650. for plumbing and heating work (Exhibit 8) by plaintiff becomes irrelevant and justifies a judgment for defendants.
Assuming, however, the relevancy of these costs in measuring damages, it would be speculation to adopt them in the present state of the evidence.
Repairs means the restorations of an existing thing to a sound or good condition after decay, dilapidation or injury rather than making something new. Ingalls v. Roger Smith Hotel Corporation, 143 Conn. 1.
"An improvement would be a change in the original construction or installation in order to incorporate advancements in design. A repair restores the original conditions an improvement changes supposedly for the better the original condition. Masterson v. Alherton, 149 Conn. 302, 312. CT Page 7569
The premises in question were a small area of a substantially larger commercial center having other tenants. The amount of the expenditures for repairs and replacement are over $26,850., a substantial amount inviting further inquiry. Moreover, the expenditures were based on flat figures on total work. The expenditures were not itemized to permit a fair comparison with what may have been the conditions when defendants occupied the premises. The evidence would not show to what extent the cost of the claimed repairs and replacement of the claimed wrongful injuries may or may not involve an improvement to plaintiff's property or to the arrangement or coordination of the former existing conditions.
 III.
All claims and evidence considered, judgment is hereby entered in favor of defendants.
Philip R. Pastore State Trial Referee